799 So.2d 714 (2001)
D.O.H., Sr.
v.
T.L.H. now C.
No. 01-174.
Court of Appeal of Louisiana, Third Circuit.
October 31, 2001.
*716 R. Greg Fowler, Attorney at Law, Alexandria, LA, Counsel for D.O.H., Sr.
T.L.C., in proper person.
Court composed of HENRY L. YELVERTON, BILLIE COLOMBARO WOODARD, and MICHAEL G. SULLIVAN, Judges.
YELVERTON, Judge.
This is the second time this custody dispute has been appealed. In Hicks v. Hicks, 98-1527 (La.App. 3 Cir. 5/19/99); 733 So.2d 1261, another panel of this court reversed an award of joint custody of three minor children which had designated the father the primary custodial parent during the school year and the mother the custodial parent during the summer. On that appeal, we decided the case de novo. Applying the Post-Separation Family Violence Relief Act, Louisiana Revised Statutes 9:361-369, we awarded sole custody of the children to the mother. We based our reversal and judgment on a finding that the mother proved by a preponderance of the evidence that the father had committed at least one act of violence resulting in serious injury and more than two acts of violence which were not refuted.
Before this court handed down its decision on that appeal, both parties had filed rules for contempt which had been set for May 21, 1999. Our decision was handed down on May 19, 1999, just two days before the hearing date for these rules. Reacting to our decision, the parties at the hearing entered a stipulation dismissing the rules for contempt and fixing a specific plan of visitation. Later that same day, allegations were made by the oldest minor child that she had been sexually abused by her mother and her mother's new husband. Subsequent evidence established that the child had earlier (i.e., before our decision was handed down) confided to friends that something bad had happened to her while she was in Canada. She also accused the new husband of physical and emotional abuse of the two younger children.
Three days later on May 24, 1999, because of the bizarre nature of the allegations and the fact that they arose when the children were to be returned to the mother, the trial court went into juvenile session and in its juvenile capacity placed the oldest minor child with the paternal grandparents with supervision by the Louisiana Office of Community Services (OCS). At the same time, in compliance with our judgment, the trial judge returned the two youngest children to the mother. The trial court ordered that a report be referred to Family Services in Canada or the equivalent agency, since that was where the mother was then living (and lives still). OCS referred the oldest minor child and the father to counseling. The father then completed an anger management program.
In November 1999, the father filed another rule for custody. At a hearing on March 17, 2000, the OCS made an appearance, through its counsel, and recommended that custody of the oldest child be transferred to the father. The trial court asked for the views of counsel for the parents regarding that recommendation. When counsel for the mother responded that they were not opposed to the recommendation of the State "based upon the history of this case," provided that it was understood that their acquiescence in the OCS recommendation was not to be taken as a waiver of her rights under the Family Violence Relief Act, the trial court returned custody of the oldest minor child to *717 the father.[1] The rule to change custody as to the other, younger children was continued until June 26, 2000. After hearing testimony and reviewing evidence introduced at that hearing, the trial court determined that the best interests of the minor children were to award sole custody to the father, with the mother having visitation of the youngest children. In reviewing the evidence, the trial court, pursuant to Louisiana Revised Statute 46:56, considered the voluminous OCS record introduced at trial after an in-camera inspection revealed its relevance to the matters at issue.
The mother now appeals the change of custody. We affirm. We recognize that relaxed evidentiary standards are used to determine custody pursuant to Louisiana Code of Evidence Article 1101, and that these standards are applicable to custody determinations under the Post Separation Family Violence Relief Act. Folse v. Folse, 98-1976 (La.6/29/99); 738 So.2d 1040.

TREATMENT PROGRAM
On this appeal the mother has listed five assignments of error. They can be grouped into two. Her first assignment concerns the treatment program that the father underwent pursuant to this court's remand in the earlier appeal. She argues that the father has not completed a valid treatment program as defined by the Family Violence Relief Act.
According to Louisiana Revised Statute 9:364(A), once it is proven that a parent has a history of family violence, the "presumption shall be overcome only by a preponderance of the evidence that the perpetrating parent has successfully completed a treatment program as defined in R.S. 9:362...." A treatment program is defined in Louisiana Revised Statute 9:362(7) as "a course of evaluation and psychotherapy designed specifically for perpetrators of family violence, and conducted by licensed mental health professionals."
When the OCS entered the case after our remand in 1999, it obtained evaluations from Dr. John C. Simoneaux and Dr. Rick Adams, both of whom are clinical psychologists licensed by the State of Louisiana.[2] The mother argues that Dr. Rick Adams was not qualified to conduct the statutorily required treatment program. Dr. Adams explained at the hearing that clinical psychology involves the application of psychological principles to the assessment, treatment, and prevention of emotional, behavioral, and developmental problems.
As a clinical psychologist, Dr. Adams testified that he had had training in the area of evaluation of perpetrators of family violence. Although he had worked more with perpetrators of physical abuse of children by parents rather than with spousal abuse, he stated that he had to train parents to address their problems with self control and how to handle the situations. In this case the father was referred to Dr. Adams by the OCS for anger management training.
Dr. Adams explained that his treatment of the father consisted of exposing him to *718 anger management techniques and strategies for controlling his anger. Dr. Adams met with the father for an initial evaluation and there were six subsequent sessions. During these sessions Dr. Adams went through the tactics that people use for controlling themselves and for identifying risk situations for loss of control, in addition to anger reducers and tactics for managing anger. Dr. Adams found the father to be completely cooperative during these sessions.
Although Dr. Adams admitted he did not know the specific details of the spousal abuse for which the father was receiving treatment, Dr. Adam's psychotherapy assessment indicates that he knew that the father had been physically abusive to his ex-wife, with no indication that he had abused the children. He testified that six anger management training sessions were sufficient to expose the father to the basic principles of anger management.
As a licensed mental health professional, Dr. Adams met the statutory requirements of Louisiana Revised Statute 9:362(7) and he was the one who conducted the course of psychotherapy which was administered. The attack the mother has made on the course of evaluation and psychotherapy included questioning whether the course was, in the statutory language, "designed specifically for perpetrators of family violence." She offered neither expert witness testimony nor other evidence regarding the standard for meeting the program for treatment as defined by the statute.
Dr. Adams testified he knew that the Post-Separation Family Violence Relief Act had something to do with the referral for anger management training. Dr. Simoneaux had done a forensic evaluation to determine what the father did or did not need. Dr. Simoneaux's report in evidence explained that his recommended counseling was due to spousal abuse of the mother, indicating that he was aware of the facts. The only remaining question is whether the recommended anger management program was adequate.
Although none have been suggested by the evidence nor the mother's brief, we recognize that there may be a number of psychotherapy programs available for spousal abusers, and that there may be differences amongst both lay and professional opinions as to which is most effective. Our task on this appeal is not to decide which is the best program, but to determine whether, on these facts in this case, the trial court's approval of this program as having met the statutory standard, was an abuse of discretion. We find that the father received a proper treatment program as defined by Louisiana Revised Statute 9:362(7). Dr. Adams knew that he was treating the father for spousal abuse and his treatment consisted of helping him to learn anger management. We note that the father has since remarried, and his present wife testified that he has exhibited no abusive behavior towards her. There has never been any concern that he abuses the children. We find no error in the trial court's ruling.

CUSTODY
The remaining assignments address the award of sole custody of the youngest two children to the father. The mother, who appears on appeal in proper person, does not assign error to the custody ruling as to the oldest child.
We remind the reader that on March 17, 2000, a special hearing on the custody of the oldest child was held. At that time, counsel for the mother was not opposed to the recommendation of the OCS that custody of the oldest child be transferred to the father, reserving only her right to *719 contest the father's compliance with the Family Violence Relief Act. Not being able to complete the hearing regarding custody of the two youngest children at the March hearing, the trial was recessed, and it resumed on June 26, 2000. Because we have found that the father has complied with the treatment program under the Family Violence Relief Act as previously ordered by this court, we need to discuss the change of custody only as it concerns the two youngest children.
The trial court changed custody from that ordered by us in our decree, which was a considered decree handed down May 19, 1999. To change custody, the trial court was obliged to apply the appropriate burden of proof. The supreme court, citing Hensgens v. Hensgens, 94-1200 (La.App. 3 Cir. 3/15/95); 653 So.2d 48, writ denied, 95-1488 (La.9/22/95); 660 So.2d 478 and Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), discussed the burden of proof when there has been a considered decree of custody:
[T]he paramount consideration in any determination of child custody is the best interest of the child. (La.C.C. art. 131). However, in actions to change custody decision rendered in considered decrees, an additional jurisprudential requirement is imposed. A considered decree is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children. When a trial court has made a considered decree of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is "so deleterious to the child as to justify a modification of the custody decree," or of proving by "clear and convincing evidence that the harm likely to be caused by the change of environment is substantially outweighed by its advantages to the child."
Evans v. Lungrin, 97-541, 97-577, pp. 12-13 (La.2/6/98); 708 So.2d 731, 738 (case citations omitted).
Furthermore, Louisiana Revised Statute 9:364(A) imposes an additional burden of proof for a parent who has been found to have a history of perpetrating family violence in order to overcome the presumption that he cannot be awarded sole or joint custody of the children. In addition to proving that he has successfully completed a treatment program as defined by the Family Violence Relief Act, the father must also prove that he is not abusing alcohol nor using illegal drugs. He must additionally, prove that the best interests of the children require him to be the custodial parent because of the other parent's absence, mental illness, or substance abuse, or such other circumstances which affect the best interests of the children.
In child custody cases, the decision of the trial court is to be given great weight and overturned only where there is a clear abuse of discretion. Thompson v. Thompson, 532 So.2d 101 (La.1988).
We have already determined that the father successfully completed a treatment program, and there was evidence by the father establishing that he was not abusing alcohol or using illegal drugs. In reasons for judgment the trial court considered and discussed all of the factors listed in Louisiana Civil Code Article 134 in determining the best interests of the children and found that there were circumstances that required the father to have sole custody of the two youngest children. Mindful of the heavy burden the father had to prove that a change of custody was warranted, we find, as did the trial judge, that he met that burden, for the following reasons.
*720 The first circumstance is the allegation by the oldest child that her stepfather had sexual intercourse with her while her mother held her arms. Both the mother and stepfather denied that there was such an occurrence. The OCS investigated the allegations. The investigation included interviewing the parties involved, interviewing the oldest child's friends and boyfriends, a doctor's examination, and a psychiatric evaluation. There were also letters the oldest child wrote to her friends in March and early May 1999 indicating that something happened to her in Canada causing her fear of returning to Canada. These letters were written well before our May 1999 ruling awarding sole custody of this child to the mother. This child testified at the hearing involving her brother and sisters. Although the oldest child's complaint is hard to believe, the OCS determined from its lengthy and thorough investigation that the complaint was valid.
There was also evidence that the youngest children were abused by the stepfather and mother. For example, there was testimony that while the youngest child was toilet training, the stepfather would place the child's face in her own feces when she either had an accident on the floor or would take her feces out of her diaper and wipe it on the wall. There was testimony that the stepfather kicked the middle child in the back of the legs which caused bruising. The stepfather's version of the incident differed, but the middle child said that his stepfather had kicked him when he was trying to tie his shoes. He told his mother, but she did not do anything about it. He did not want to go back to Canada with his mother.
The record also establishes a refusal on the mother's part to facilitate a relationship between the children and the father. She purposefully disobeyed orders of the trial court in refusing to return the custody of the children to the father on two separate occasions. The mother even failed to notify the father that she was bringing the youngest children on a trip to Disneyworld in Florida where perhaps the father and oldest child could have visited with the two youngest children. The father testified that he had a hard time getting in touch with the children during the designated telephone-visitation hours because the phone line was always busy. The OCS staff records corroborated this indicating that they too had a hard time reaching the mother because the line was always busy. There was evidence that the mother was a frequent user of the Internet, which is how she met her current husband while she was still married to the father of these children, and apparently the inability to make contact by telephone was caused by the Internet connection.
There was also testimony that both the mother and father have extended family, including grandparents, living near the father's residence in Louisiana. The oldest child testified that two grandparents, an aunt, two uncles, and seven cousins lived right down the road from her father's house, and other close family members of both her father and her mother live a five, ten, and fifteen minute drive away. She sees her grandparents nearly every day. There is no extended family living in Canada. Since their move to Canada, the two youngest children have had little or no contact with the other family members.
The father remarried on July 4, 1999. His new wife has two sons of her own who live with them. Both the father and stepmother testified that there is adequate room in their expanded, four-bedroom home for all the children. The oldest child testified that she gets along well with her stepmother even though they have disagreements every now and then. She also *721 gets along well with her two stepbrothers. The paternal grandmother who previously had custody of the oldest child testified that she would help with the two youngest children if they came back to Louisiana.
We realize that "with the new decision-making rules and the ability of parents to communicate instantly when necessary by telephone or other means, the distance separating the parents assumes less importance in determining whether sole legal custody is a better custody arrangement than joint legal custody." Evans, 708 So.2d at 739. However, in this case the mother has consistently shown an unwillingness to foster a relationship between the children and father. Furthermore, she has twice intentionally disobeyed orders of the trial court to return the children to the father. Also, the allegations made by the oldest and middle child against the mother and stepfather are very serious and have been validated by an OCS investigation. We find that the father has clearly proven a material change in circumstances and that continuation of the present custody arrangement would be so damaging to the children as to justify a modification of the custody decree. The trial court did not err in awarding sole custody of the two minor children to the father.
For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the mother.
AFFIRMED.
WOODARD, J., dissents and assigns written reasons.
WOODARD, J., dissenting.
This case is crucial because, as well intentioned as it might be, the majority's decision bankrupts the Post-Separation Family Violence Relief Act, destroying any chance for relief for families, who are suffering from domestic violence and its fallout, and permitting the cycle of violence to continue. Based on the majority's opinion, future batterers need only show that they have attended six, one hour sessions, which "exposed" them to the basic principles of anger management, instead of proving that they have had meaningful psychotherapy and that they no longer pose a danger. As such, no cycle of abuse will ever be broken, through this Act, as the legislature intended.

* * * * *
The instant case is one of egregious spousal abuse: Mr. D.O.H. beat Ms. T.L.H.C. so severely with a broom stick that her own mother did not recognize her when Ms. T.L.H.C. went for help; Mr. D.O.H. gave Ms. T.L.H.C. a black eye, which an elderly, male neighbor testified that he saw and that Mr. D.O.H.'s had admitted to him that he gave it to Ms. T.L.H.C.; Mr. D.O.H. picked up Ms. T.L.H.C. with a two by four under her neck and threw her off the porch; Mr. D.O.H. beat Ms. T.L.H.C. in the belly so severely that it caused her to miscarry their child; Mr. D.O.H. raped her on numerous occasions; Mr. D.O.H. squeezed her hand so hard, the ring, which she was wearing, almost broke and left an indentation in her finger; Mr. D.O.H. threw her into a chair which caused her to hit her head against the fish tank.

* * * * *

Legislative Intent of the Post Separation Family Violence Relief Act
When the Louisiana Legislature passed the Post-Separation Family Violence Relief Act (the Act) in 1992, it was, obviously, reacting to and trying to solve a dangerous, systemic, societal problemdomestic abusewhich had garnered nationwide concern.
*722 In 1990, both the U.S. House of Representatives and U.S. Senate, unanimously, passed House Resolution 172, which recognized the emotional harm to children, who witness domestic violence,[1] and the need to address domestic violence in custody litigation. Congress suggested "for the purposes of determining child custody, credible evidence of physical abuse of one's spouse should create a statutory presumption that it is detrimental to the child to be placed in the custody of the abusive spouse."[2]
It was well known that spousal abuse represents one of the greatest threats to women in the United States.[3] From 1988 to 1991, 42% of murdered women had been killed by their partners.[4] In a 1993 national survey, 3.9 million women in the United States reported physical abuse by their spouse or partner in the previous year.[5]
Studies estimate that between three and ten million children are exposed to interparental violence each year.[6] Associated with that exposure is an array of emotional and psychological harm to the children.[7] In the 1982 U.S. Civil Rights Commission's report, The Federal Response to Domestic Violence, stated that children witnessing spousal abuse suffer as much as other family members.[8] The 1984 U.S. Attorney General's Task Force on Family Violence concluded that children carry the lessons of violence into adulthood.[9] Children raised in violent homes are six times more likely to attempt suicide than children in non-violent homes.[10] They also tend to drink, carry weapons, and take more personal risks than other children.[11] Fifty percent of children who witness inter-parental abuse, before the age of ten, develop psychiatric problems later in life.[12] Seventy-five percent of boys, who witness domestic violence, have been found to have demonstrable behavior problems.[13] Alarming studies suggest that children's *723 exposure to adult, domestic violence may justify their own use of violence.[14] "Men who have witnessed their parents' domestic violence are three times more likely to abuse their own wives than children from non-violent parents, with the sons of the most violent parents being 1000 times more likely to become wife beaters."[15] Of profound importance, because it perpetuates the cycle of abuse, is the fact that a son who witnesses the abuse of his mother is more likely to become a batterer than one whose father beats him.[16]
Even children, who do not directly witness domestic violence, are strongly affected by it.[17] Most of the children, at very young ages, are aware of the violencewhether they observe it first-hand or not. The State Justice Institute, which funded the 1993 National Conference on Domestic Violence, warned: "children are not unaware of violence just because they don't see it[.]"[18]
From this back-drop, the Louisiana Legislature fashioned the Act. It stated its intended purpose in La.R.S. 46:2121:
A. The legislature hereby finds and declares that there is a present and growing need to develop innovative strategies and services which will reduce and treat the trauma of family violence. Available studies documenting police statistics indicate that thousands of persons in this state are regularly beaten, tortured, and, in many cases, killed by spouses or persons with whom they are living in a primary relationship. These studies further indicate that victims of family violence come from all socioeconomic classes and ethnic groups, though it is the poor who suffer most from family violence, since it is less likely that they have immediate access to private counseling and shelter for themselves and their children. Children, though often not physically assaulted, suffer deep and lasting emotional effects, and it is most often the children of those parents who commit family violence that perpetuate the cycle by abusing their spouses.

. . . .
C. It is the intention of the legislature to achieve a reduction in serious and fatal injuries to the victims of family violence and to clarify the problems, causes, and remediation of family violence by providing that necessary services including shelter, counseling, and referrals to social services, medical care and legal assistance in the form of a family violence center.
(Emphasis added.)
And, in its minutes for the Act, the legislature emphasized that "the bill is intended to break the cycle of child abuse so that it does not continue to occur from generation to generation. The bill calls for a strict procedure [.]" (Emphasis added.) And, "[t]he bill sets strict criteria for how child custody and visitation proceedings should be handled when there is a history of domestic violence. The bill requires the perpetrators of domestic violence to complete two very specific therapy programs as a condition for access to the children." (Emphasis added.) And, *724 "the problems of family violence do not necessarily cease when the victimized family is legally separated or divorced. In fact, the violence often escalates, and child custody and visitation become the new forum for the continuation of the abuse. Because current laws relative to child custody and visitation are based on an assumption that even divorcing parents are in relatively equal positions of power and that such parents act in the children's best interest, these laws often work against the protection of the children and the abused spouse in families with a history of family violence. Consequently, laws designed to act in the children's best interest may actually effect a contrary result due to the unique dynamic of family violence."[19] (Emphasis added.)
Beyond doubt, our legislature intended to institute an act which would eliminate domestic violence. In the Act, it requires the perpetrator of family violence to prove that: (1) he has successfully completed "a course of evaluation and psychotherapy designed specifically for perpetrators of family violence," (2) "conducted by licensed mental health professionals,"[20] having (3) "current and demonstrable training and experience working with perpetrators and victims of family violence," and (4) he no longer poses a danger.[21] (Emphasis added.) This implies that the batterer must under-go meaningful psychotherapy, which is effective in changing his behavior.
While the legislature did not provide the details of its intended programs, there are many highly respected ones to chose from as models. None of them are mere "exposures" to the basic principles of anger management.

STANDARD BATTERER INTERVENTION PROGRAMS
Anger management sessions are not a substitute for psychotherapy. Many experts in the psychological community criticize the use of anger management programs, as a form of batterer intervention, because they fail to address the batterer's real problem. For example, various anger management programs, simply, teach batterers to recognize signs of anger and to implement relaxation and stress management techniques,[22] as well as communication skills.[23]Anger management is also criticized because it embodies the false assumption that spousal abuse is based on uncontrollable anger,[24]rather than on anger being the batterer's device to control women. Significantly, anger management, erroneously, implies that the victim provokes the anger and abuse,[25] which is counter-productive to changing the batterer's attitude and harmful behavior, since anger management misplaces the responsibility for the problem and gives the batterer validation for his aberrant behavior. In addition, men can use the anger management program in the same *725 way that they use their violenceto manipulate and control their wives.[26] Most importantly, some studies have shown a recurrence of violence among anger management program participants who said that they used anger management to reduce their violence.[27]
All batterer intervention should acknowledge that violence against women is a learned behavior, and that batterers use violence to maintain control over their partners.[28] Thus, intervention should focus on learning nonviolence and the appropriate sharing of power and communication within the relationship; identify, confront, and change all forms of abusive and controlling behaviors; discuss the impact that violence has on the victim; confront the denial and minimizing of abusethe program must emphasize that the batterer is solely responsible for the abuse and that abuse is a willful choice that is never justified; identify cultural and social sources of attitudes toward women that contribute to abusive behavior.[29] In other words, the intervention method must actively challenge and modify inappropriate behavior and attitudes towards women and control.
Generally, intervention programs include intake, encompassing a complete history of abuse, which, neither, Dr. Simoneaux nor Dr. Adams had, and an ongoing lethality assessment,[30] neither conducted. (Emphasis added.) The preferred format for batterer intervention programs is ongoing, same-sex groups, which two co-leaders (male and female) facilitate.[31] Also, group intervention is the preferred format cited in 90% of the standards; overwhelmingly, individual intervention is regarded as inappropriate.[32] Most nationwide standards for batterer intervention programs, as of 1997, suggest a minimum of 24 to 26 weeks.[33] Mr. D.O.H. received individual anger management training for one hour per session, for a total of six sessionsfar from the 24 to 26 week minimum standard.
Facilitators should be licensed or certified mental health service providers; completed at least 20 hours of victim-centered training; have training and experience at facilitating psycho-educational groups; have completed a nationally-recognized training program in providing batterer intervention services (e.g. the Duluth Model or EMERGE), which specifically addresses the dynamics of domestic violence within the context of power and control, the effects of domestic violence on victims and their children, the nature of domestic violence, the role of the facilitator, lethality assessment, teaching alternatives to violent and controlling behavior, and avoidance of facilitator collusion with batterers.[34] Additionally, batterer intervention *726 service providers should complete at least ten hours per year of continuing training.[35]
The majority notes that "[a]lthough none have been suggested by the evidence nor the mother's brief, we recognize that there may be a number of psychotherapy programs available for spousal abusers, and that there may be differences amongst both lay and professional opinions as to which is most effective. Our task on this appeal is not to decide which is the best program, but to determine whether, on these facts in this case, the trial court's approval of this program as having met the statutory standard, was an abuse of discretion."
Indeed, the court's task is not to decide which program, among all the effective models, is the best; however, the legislature made "effectiveness" an issue. In fact, it made it explicit in its Act and in its minutes that results are paramount and that the perpetrator has the burden of proving them. Thus, the court must decide whether the "program" was effective in producing the result that Mr. D.O.H. would no longer pose a danger, which Dr. Adams could not say was the case.
Nor did Dr. Simoneaux or Dr. Adams provide any of the standard criteria for credentials or programs or address Mr. D.O.H.'s real psychological problems as a batterer. This is supported below.

APPLICATION OF THE ACT/MR. D.O.H.'S "COMPLIANCE"
Originally, in May 1998, the trial court did not require Mr. D.O.H. to comply with the Act. Although, it found that he had been "somewhat" abusive towards his wife, it awarded him primary, custodial parent status of the three children.[36] On May 19, 1999, this court reversed that ruling, awarding custody to Ms. T.L.H.C., and remanded the case, ordering the trial court to apply the Act and to deny Mr. D.O.H. visitation and custody consideration, until he had met his burden of proving, in court, that he had successfully completed treatment in accordance with the Act's specific requirements.[37]
The trial court convened on May 21, 1999 to adjudicate the parties' pending "counter-availing" rules on contempt, which they determined were made moot by our reversal. It was during this time period that the trial court was faced with a dilemma. For the first time, N.H., the oldest daughter, alleged that her mother had held her down while her step-father had raped her and that he had pushed a sibling's face into her own feces, inter aliaincredibly heinous acts, if true, warranting the immediate removal of the children from the mother's care, pending an investigation.
Accordingly, the trial court awarded custody of N.H. to her paternal grandparents but permitted the two younger siblings to return to Canada with their mother.
Subsequently, before Mr. D.O.H. complied with our order and the Act, he was permitted unsupervised visitation of his oldest daughter, N.H., from October 1999 until December 1999, when he was given custody, which the trial court formally sanctioned on March 17, 2000, again, without proper evidence of compliance.
Permitting him unsupervised visitation and, ultimately, custody, without an adjudication of his compliance, was in total disrespect of this court's May 19, 1999 order and of the Act's mandate. While it appears, from the record, that Ms. *727 T.L.H.C.'s counsel acquiesced to the lower court's March 17, 2000 ruling, the trial court should not have permitted it,[38] not only because parties may not stipulate to defy a court order,[39] but, more importantly, because awarding Mr. D.O.H. custody, at that time, was not in the child's best interest.[40]
N.H. testified, about her allegations of abuse, at the June 26, 2000 hearing. The trial court was to determine whether Mr. D.O.H. had complied with the Act and was legally eligible for custody of the two younger siblings, which were in Ms. T.L.H.C.'s custody.
Through various e-mails and letters, which fifteen-year-old N.H. wrote around the time that she alleged abuse, we learned, that: she desperately wanted to stay in Louisianaa primary reason was that she had a boyfriend, with whom she was romantically involved and to whom she had professed her love and, essentially, that she could not bear to live without; her brother and sister do not want to live with their fatherher brother does not like his father; N.H. feels a tremendous hostility towards her mother, which conforms to experts' fear that, in domestic violence homes, the children tend to identify with the batterer and lose respect for the battered.[41]
Just a few months before our 5/19/99 order, N.H., who was living with her father, sent her mother an e-mail, warning her of unspecific, ominous consequences, should she get custody. N.H. wrote: "... this isn't a threat this is a promise!!! you may not think there isn't much a 15 year can do!!! but this one knows a few tricks or two!!! You think the hell you went through while I was there was bad enough!!! Try me!!!!!!" N.H. denied sending this, but Ms. T.L.H.C.'s counsel pointed out that, due to technological identification capability, it came from the computer which she was using. Other contents in the e-mail were also, obviously, N.H.'s words.
After N.H.'s allegations and before the June 26, 2000 hearing, the Canadian organization, presumably, equivalent to Louisiana's Office of Community Services (OCS), as well as the Canadian Police Department, investigated and found her allegations to be unfounded. No authority ever charged or arrested Ms. T.L.H.C. or her husband. No one corroborated any of N.H.'s allegations, including her siblings regarding their alleged abuse. Terri Theaux, a family counselor, stated that although she believed N.H., it is not possible to absolutely tell if she is telling the truth about the abuse. What was known at the June 26, 2000 trial, is that N.H., more probably than not, did not tell the truth about at least one other incident involving herthe threatening e-mail to her mother, promising "tricks."
Nevertheless, her veracity was a credibility determination within the trial court's discretion. Apparently, it did not believe her allegations of abuse, otherwise, it would not have permitted her younger siblings to return to a potentially dangerous environment in May, 1999, after the allegations surfaced.
At the June 26, 2000 hearing, only the custody of N.H.'s two younger siblings was at issue. Nevertheless, this was the first *728 time that the trial court required Mr. D.O.H. present evidence regarding his compliance with the Act.
Mr. D.O.H.'s "compliance" consisted, only, of evidence that he had completed six sessions of anger management, not designed specifically for perpetrators of spousal abuse, conducted by a clinical psychologist, not currently trained to deal with perpetrators of spousal abuse; and he received no psychotherapy. The majority opinion notes that OCS referred him and his oldest daughter to counseling. This might imply that he attended counseling with her. However, he did not. He did meet with her counselor to receive a report regarding his daughter's status when she completed counseling. Regarding his own "therapy," he participated, only, in Dr. Adams' six sessions, exposing him to basic principles of anger management. Dr. Adams could not say that he no longer poses a danger. Mr. D.O.H. presented no other competent proof that he no longer poses a danger. Accordingly, he did not overcome his statutory presumption of unfitness for unsupervised visitation or custody.
Specifically, the record establishes Dr. Adams as a clinical psychologist with considerable experience in child psychology, learning disabilities, and parental training. However, he has no significant experience regarding the physical abuse of intimates, save a rotation during an internship more than 19 years ago, and he never completed any specialized work in this area. By his own admissions, he was not qualified, under the Act, to handle this case. While, he conceded that he did not have current, specialized training or experience with perpetrators of spousal abuse, he noted that "domestic violence" is not a sub-specialty of psychology, which required a separate license. This is true. However, the legislature recognized domestic violence as having a unique psychological dynamic,[42] which requires current, specialized training and experience in order to, effectively, deal with it.
This situation is analogous to the legal profession. For example, Dr. Adams is similar to lawyer, who is a general practitioner in civil law, took the requisite courses in criminal law while in law school. Nineteen years later, he is asked, for the first time, to represent a criminal defendant in a murder case, for which the rules of procedure, the strategy, and the approach are different. While his license would permit him to take the case, it can hardly be said that he is equipped with the current knowledge, training, or experience to do so. In fact, his path can be littered with mines, which he does not have the ability to perceive. This is why the legislature, restricts who can treat batterers and provides for strict and explicit qualifications, in the Act.
In addition to having inadequate credibility, under the Act, Dr. Adams admitted to the impotency of his sessions. He testified that: these sessions were limited in scope to "exposing" Mr. D.O.H. to the basic principles of anger management; he did not administer psychotherapy to Mr. D.O.H.; his sessions were not designed for perpetrators of family violence; he was not familiar with the Act; he had no knowledge of the content of the OCS' report; he did not know the severity, nature, and extent of Mr. D.O.H.'s domestic violence; he only knew what Mr. D.O.H. told him, which was that he did not have a problem.
Essentially, Dr. Adams conceded these sessions were not designed to deal, or capable of dealing, with the deeply-rooted *729 psychological problems, which Mr. D.O.H., obviously, possesses, as a batterer. He added that such a person, with Mr. D.O.H.'s history, would benefit from ongoing psychotherapy but that it was not his task to administer psychotherapy, therefore, he did not do so. He explained that Dr. Simoneaux, ultimately, determined what Mr. D.O.H. needed, but we find no evidence in Dr. John C. Simoneaux's, Ph.D. psychological evaluation that he was aware the details, nature, or severity of Mr. D.O.H.'s pattern of violence, either, contrary to the majority's assertion. Furthermore, Mr. D.O.H. presented no evidence to indicate that Dr. Simoneaux possesses the requisite statutory credentials to deal with spousal abuse and, therefore, make appropriate treatment recommendations, under the Act. Notwithstanding, it is noteworthy that OCS, not Dr. Adams or Dr. Simoneaux, actually, determined what Mr. D.O.H. would receive. There is no evidence in the record that OCS satisfies the statutory mental health professional qualifications for making treatment recommendations. In fairness to Dr. Adams, it appears as if he worked with what he was given and did exactly what was requested of him.
Further, Dr. Adams admitted that, without knowledge of Mr. D.O.H.'s abusive history, which the record shows that Dr. Simoneaux did not have, a professional would not be able to conduct a proper evaluation to assess his needs and, therefore, apply appropriate psychotherapy.
Moreover, Dr. Adams cautioned that there was no way for him to test the sessions' efficacy and "I don't know for sure how he would handle it if he were once again in a problematic marriage." All Dr. Adams knows is that Mr. D.O.H. can recite the terms to which he "exposed" him. He cannot say that Mr. Hicks does not, still, pose a danger.
What is strikingly significant and indicative of the sessions' lack of any positive impact on or change in Mr. D.O.H. is his continued denial and refusal to acknowledge, even that he has a problem, and, therefore, his refusal to accept responsibility and to be accountable for his violence.
Mr. D.O.H. has minimized or denied his abuse throughouteven when there was objective evidence proving itfrom the original 1998 custody trial, in his interview with Dr. Simoneaux, through his anger management sessions, and at the June 26, 2000 custody hearing, where he was suppose to enter evidence, essentially, of his "reform," which necessitates an acknowledgment of previous wrong-doing.
Yet, at that hearing, Dr. Adams portrayed Mr. D.O.H. as having been cooperative. And, Mr. D.O.H. portrayed himself as having been the perfect husband and father, who did not have and never did have an "anger problem." In fact, he, especially, wanted the court to know that he would never, even, say anything disparaging to his children about their mother because it "would disrespect his children," yet, apparently to him, giving their mother a black eye, and other abuse, would not disrespect the children. This is interesting thinking, to say the least, which was, apparently, undaunted by six anger management sessions.
He also wanted the court to know that, now, he was in a better marriage, apparently, to imply that there would be no need for abuse. He proudly declared, "If I put out a cigarette butt, it ain't long and she's gone and emptied the ashtray and washed it."
Additionally, while Mr. D.O.H. admitted to shoving Ms. T.L.H.C., he minimized its importance. He did not consider shoving his wife to be indicative of domestic violence. *730 However, experts do,[43] and they warn that "[a]mong the most prevalent characteristics (of a batterer) is the tendency to minimize or deny the seriousness of their violent behavior."[44]
In addition to his adamant, unwavering denials, Mr. D.O.H. proved to be adept at manipulation, another tool, which a batterer uses to control. "Batterers, like other con men, are often very manipulative and can appear both charming and seductive."[45] Indeed, Dr. Simoneaux (who, it appears, spent only one session with him) and Dr. Adams, not knowing the truth, believed Mr. D.O.H. to be "normal." This gross misperception would seem to be a primary, salient reason for the requirement that the mental health professional have current training and work, specific to perpetrators of family violence.
Even though, Dr. Adams testified that he could not say that Mr. D.O.H. no longer poses, danger, the majority attempts to convince us, that because Mr. D.O.H.'s present wife testified that he has not battered her, his "exposure" to the basic principles of anger management was sufficient to change his long-term, deeply rooted, destructive behavior.
All the previously noted studies and conventional wisdom indicate the opposite and, sadly, that abuse of his current wife is just a matter of time. "Episodes of batterers' violent acts seem to increase in frequency and intensity over time[.]"[46] At the time of the June 26, 2000 proceeding, in which the second Mrs. D.O.H. testified, they had been married for less than a year. Also, "[a] batterer will beat any woman he is with if the woman is with them [sic] long enough for violence to begin: situational circumstances do not make a person abusive."[47] (Emphasis added.) A batterer's psychological problems do not go away on their own and without proper, intense intervention, even if circumstances change, like a new marriage. He, simply, carried his problems into the new situation.
The majority suggests that it was Ms. T.L.H.C.'s responsibility to demonstrate, that Mr. D.O.H. did not satisfy his burden, by bringing in her own experts. It states that "The attack the mother has made on the course of evaluation and psychotherapy included questioning whether the course was, in the statutory language, `designed specifically for perpetrators of family violence.' She offered neither expert witness testimony nor other evidence regarding the standard for meeting the program for treatment as defined by the statute." This might be true if Mr. D.O.H. had admitted prima facie evidence that he had had psychotherapy, designed specifically for perpetrators of spousal abuse, conducted by a mental health professional, possessing current training and experience in this area. Then, Ms. T.L.H.C. could bring in her comparably credentialed experts to negate his assertions and argue about whether he still poses a danger.
However, Mr. D.O.H. failed in his prima facie burden of proof, on all four statutory requirements, based on his own expert's testimony. There is nothing for Ms. T.L.H.C. to refute. Furthermore, no where in the statute does it say any burden shifts to her.
*731 Accordingly, the trial court did not have the discretion to accept less proof of "compliance," than the Act permits, and erred by doing so. Since, Mr. D.O.H. did not carry his burden of proof, he should not be permitted to have custody of the three children until he does and, further, proves that it is in their best interest under La. Civ.Code art. 134. This is for the children's protection and best interest.

CONCLUSION
Without further inquiry or evidence, on its face, it is apparent that Mr. D.O.H. has not carried his prima facie burden of proving his compliance with the Act's requirements and intent. His six sessions of "exposure" to the basic principles of anger management were merely "cosmetic" and far from adequate to satisfy the strict, specific, statutory mandate. Indeed, were they the accepted way to treat a batterer, we could expect that none of the reputable, in-depth programs, discussed above and enforced by other states' courts and the federal government, would exist.
In drafting the Act, the legislature, emphatically, stated its purpose, which was "to recognize and address the complex legal and social problems created by domestic violence. The legislature finds that existing laws which regulate the dissolution of marriage do not adequately address problems of protecting and assisting the victims of domestic abuse. The legislature further finds that previous societal attitudes have been reflected in the policies and practices of law enforcement agencies and prosecutors which have resulted in different treatment of crimes occurring between family or household members and those occurring between strangers. It is the intent of the legislature to provide a civil remedy for domestic violence which will afford the victim immediate and easily accessible protection. Furthermore, it is the intent of the legislature that the official response of law enforcement agencies to cases of domestic violence shall stress the enforcement of laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated."[48] (Emphasis added.)
Surely, the legislature meant to extend its intent to the courts, in which it entrusted enforcement of the law, which would eradicate this insidious cancerabuse that eats away the most basic human rights.
"Violent behavior, usually used by men against women or children, is produced and reinforced by a society which tolerates it. Thus, elimination of the systematic discrimination against women as well as changing our attitudes which foster violence will be the only way to stop men from battering women they love."[49]
Typically, battered women are criticized for not leaving the abusive situation with their partners. In fact, often, the implication is that they deserve what they get for staying. Many times, they stay because they fear that if they leave, they will lose custody of their children to the batterer. In fact, that is exactly what happened in Ms. T.L.H.C.'s case. To remedy this problem, the legislature, instituted this legislation.[50]
*732 Ironically, in 1992, the National Council of Juvenile and Family Court Judges held Louisiana up to the rest of the country as having the likely model for legal reform efforts because, different from other states, our law extensively articulated the safeguards for abused parents and children.[51] While statutory language, addressing the nexus between domestic violence and appropriate custodial awards, varied among the other jurisdictions, none included the specificity of Louisiana's at the time.[52]
Tragically, without meaningful batterer intervention, as the Louisiana legislature mandated, the present Mrs. D.O.H. is at an extraordinarily high risk, over time, to become another victim of Mr. D.O.H.s' abusive behavior; his children will likely become part of the national statistics; and society will continue to pay the price.
Treating the batterer, serves the entire family, and, ultimately, all of us.
NOTES
[1] The father completed the anger management training on October 28, 1999. On December 30, 1999, the OCS, which had become very active in the case, had filed its own petition for transfer of unsupervised custody to the father, and simultaneously sought verbal permission from the juvenile court for permission to transfer custody on a trial basis. This was done the next day, December 31.
[2] Although the trial court in its reasons for judgment referred to Dr. Adams as a "psychiatrist", it is apparent that this was a typographical error.
[1] AMERICAN BAR ASSOCIATION. THE IMPACT OF DOMESTIC VIOLENCE ON CHILDREN: A REPORT TO THE PRESIDENT OF THE AMERICAN BAR ASSOCIATION, fn 19 (1994).
[2] Id.
[3] Antonio C. Novello et al., From the Surgeon General, U.S. Public Health Service, 267 JAMA 3132 (1992).
[4] KERRY HEALEY, CHRISTINE SMITH, AND CHRIS O'SULLIVAN. U.S. DEPARTMENT OF JUSTICE: OFFICE OF JUSTICE PROGRAMS; NATIONAL INSTITUTE OF JUSTICE. BATTERER INTERVENTION: PROGRAM APPROACHES AND CRIMINAL JUSTICE STRATEGIES (Feb. 1998).
[5] Id.
[6] B.E. Carlson, Children's observations of interpersonal violence. A.R. EDWARDS (ED.), BATTERED WOMEN AND THEIR FAMILIES (pp. 147-67). New York: Springer (1984).
[7] Howard Davidson. A.B.A. Ctr. On Children & L. 1, 1-2. THE IMPACT OF DOMESTIC VIOLENCE ON CHILDREN, 1994.
[8] AMERICAN BAR ASSOCIATION. THE IMPACT OF DOMESTIC VIOLENCE ON CHILDREN: A REPORT TO THE PRESIDENT OF THE AMERICAN BAR ASSOCIATION, fn 13 (1994).
[9] Id.
[10] Susan Guarino, Massachusetts Dep't of Youth Servs., Delinquent Youth and Family Violence 16 (1995).
[11] Marilyn Augustyn, et al., Silent Victims: Children Who Witness Violence. 12 CONTEMP. PEDIATRICS 35, 36 (1995).
[12] Laura Taylor, et al., Witnessing Violence by Young Children and Their Mothers, 15 J.DEV.&BEHAV.PEDIATRICS 120 (1994).
[13] Peter G Jaffe, et al., Promoting Changes in Attitudes and Understanding of Conflict Resolution Among Child Witnesses of Family Violence, 18 CANADIAN J. OF BEHAVIORAL SCIENCE REVIEW 356-66 (1987).
[14] Id.
[15] STRAUS & GELLES, & STEINMERTZ, BEHIND CLOSED DOORS, 1980.
[16] Clare F. Carroll, Domestic Violence and Its Impact on Child Custody and Visitation Determinations. 11 MASS. FAM. L.J. 89, 90 (1994).
[17] AMERICAN BAR ASSOCIATION. THE IMPACT OF DOMESTIC VIOLENCE ON CHILDREN: A REPORT TO THE PRESIDENT OF THE AMERICAN BAR ASSOCIATION, fn 13 (1994).
[18] Id.
[19] La.R.S. 9:361.
[20] La.R.S. 9:362(7).
[21] La.R.S. 9:365.
[22] KERRY HEALEY, CHRISTINE SMITH, AND CHRIS O'SULLIVAN. U.S. DEPARTMENT OF JUSTICE: OFFICE OF JUSTICE PROGRAMS; NATIONAL INSTITUTE OF JUSTICE. (Feb. 1998) BATTERER INTERVENTION: PROGRAM APPROACHES AND CRIMINAL JUSTICE STRATEGIES.
[23] Id.
[24] WOMEN'S ISSUES AND SOCIAL EMPOWERMENT. DOMESTIC VIOLENCE INFORMATIONAL MANUAL. PROGRAMS FOR PERPETRATORS OF DOMESTIC VIOLENCE. MELBOURNE, AUSTRALIA. (C) NSW DOMESTIC VIOLENCE STRATEGIC PLAN, WOMEN'S CO-ORDINATION UNIT. (1991). This web-site may be found at: http://www.infoxchange.net.au/wise/DVIM/DVPrograms.html.
[25] Id.
[26] Id.
[27] E. Gondolf, Men Who Batter: How They Stop Their Abuse, Paper presented at the Second National Conference for Family Violence Researches, Durham, NC, (1984); and D. Kelso and L. Personette, DOMESTIC VIOLENCE AND TREATMENT SERVICES FOR VICTIMS AND ABUSERS, Anchorage: Atlam, (1985).
[28] Id.
[29] Id.
[30] LOUISIANA COALITION AGAINST DOMESTIC VIOLENCE. LCADV RESEARCH CONSORTIUM: A PROJECT OF THE LOUISIANA COALITION AGAINST DOMESTIC VIOLENCE. MINIMUM STANDARDS FOR BATTERER INTERVENTION PROGRAMS (SEPT. 1997).
[31] Id.
[32] Id.
[33] Id.
[34] Id.
[35] Id.
[36] Hicks v. Hicks, 98-1527 (La.App. 3 Cir. 5/19/1999) 733 So.2d 1261.
[37] Hicks, 733 So.2d 1261.
[38] La.Code Civ.P. art. 224.
[39] McDonald v. McDonald, 520 So.2d 1114 (La.App. 3 Cir.1987).
[40] La.R.S. 46:2121; La.R.S. 46:2131.
[41] Laura Crites and Donna Coker, What Therapists See That Judges May Miss: A Unique Guide to Custody Decisions When Spouse Abuse is Charged, JUDGES J. (Spring 1988).
[42] La.R.S. 9:361.
[43] Walker, Lenore E. THE BATTERED WOMAN SYNDROME, Springer Publishing Company, New York, 1984.
[44] Id.
[45] Id.
[46] Id.
[47] Lydia Walker, Projects for Victims of Family Violence. Fayatteville, Arkansas.
[48] La.R.S. 46:2131.
[49] Supra note 43.
[50] La.R.S. 46:2131. Kent Washington, Domestic Violence; Why Does a Victim Stay? This website may be found at http:// www.ci.kent.wa.us/d omesticviolence/General-Info/WhyStay.htm. Missoula County Domestic Violence; Why Victims Don't Leave. This website may be found at http://www.co.missoula.mt.us/measures/DomesticV.htm
[51] Barbara J. Hart, Esq. STATE CODES ON DOMESTIC VIOLENCE: ANALYSIS, COMMENTARY AND RECOMMENDATIONS. NATIONAL COUNCIL OF JUVENILE AND FAMILY COURT JUDGES. (1992) p. 29.
[52] Id. at 31.